UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

KRISTINA MATYSIK,

           Plaintiff,

    v.

COUNTY OF SANTA CLARA, et al.,

           Defendants.

Case No. 16-CV-06223-LHK

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 63

Plaintiff Kristina Matysik ("Plaintiff") sued the County of Santa Clara ("the County"), Santa Clara County Sheriff Laurie Smith ("Smith"), and Christina Jieun Choi ("Choi") for federal and state causes of actions arising out of Plaintiff's father's death after Plaintiff's father's release from jail. Plaintiff voluntarily dismissed Choi from this case. Before the Court are the County and Smith's motion for summary judgment. Having considered the submissions of the parties, the relevant law, and the record in this case, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment.

## I. BACKGROUND

### A. Factual Background

### 1. Vladimir's Condition Before His Arrest

Vladimir Matyssik ("Vladimir"),[1] Plaintiff's father, suffered from Alzheimer's disease and dementia. Exh. E (Deposition of David C. Perry, M.D. ("Perry Dep.")), ECF No. 64-1 at 95:12-15, 109:22-110:5.[2] Vladimir was formally diagnosed with Alzheimer's in December 2014 after blood tests, a brain MRI, a consultation with a neurologist, a consultation with an aging and memory specialist, and a lumbar puncture. *Id.* at 94:5-96:11, 97:17-98:20; ECF No. 64-1 at 183-84 (Dr. Barnes notes); Exh. G (Deposition of Natalia Johnson, M.D. ("Johnson Dep.")), ECF No. 64-1 at 166:13-15, 170:12-18. Vladimir's cognitive impairments were severe enough that he was "unable to provide informed consent [for medical procedures] on his own." Perry Dep. at 96:15.

In December 2014, Dr. Perry prescribed Aricept, a medication that slightly improves cognitive functioning in Alzheimer's patients. Perry Dep. at 95:16-96:3, 118:6-119:4. In February 2015, Vladimir told his primary care physician, Dr. Johnson, that he was not taking Aricept or the medications prescribed for his other conditions. Johnson Dep. at 171:6-17; *id.* at 185 (February note). As a result, Dr. Johnson asked a social worker to help Vladimir enroll in an adult daycare center or obtain in-home support services. *Id.* at 171:25-174:13, 175:19-22. Beginning on February 6, 2015, the County paid Plaintiff to provide in-home support services to Vladimir. Exh. KKK, ECF No. 67-1 at 5. Vladimir reported again in March 2015 that he was not taking Aricept. Johnson Dep. at 175:12-16, 191.

In July 2015, Vladimir was taken to the emergency room after he fell down and was found sleeping in a stranger's yard. Exh. H (Deposition of Tina Wu, M.D.), ECF No. 64-1 at 205:11-13, 222. Upon admission to the hospital, Vladimir "appear[ed] to be confused" and was "reaching for things in the air that [we]re not there." *Id.* at 212:13-14. Eleven days after his admission to the hospital, Vladimir was unable to "provide any history." *Id.* at 222. Blood tests revealed that Vladimir was dehydrated to the point of kidney dysfunction. *Id.* at 214:1-7. Vladimir was

---

[1] Vladimir and his wife spell their last name "Matyssik," while Plaintiff spells it "Matysik."
[2] Page numbers refer to the ECF page number stamped at the top of each page, not to the deposition page numbers.

discharged about two weeks later on the condition that his wife, Iulia Matyssik ("Iulia"), arrange for 24-hour per day supervision because the hospital's doctors and social workers did not feel it was safe for Vladimir to be unsupervised. *Id.* at 224, 226, 270. Iulia did not believe constant supervision was necessary. *Id.* at 224. Iulia and Vladimir were permanently separated but not divorced. Declaration of Iulia Matyssik ("Iulia Decl."), ECF No. 71 ¶ 5; Exh. C (Deposition of Iulia Matyssik ("Iulia Dep."), ECF No. 64-1 at 45:17-22. Iulia's name is spelled different ways throughout the record. For the sake of simplicity, the Court uses only "Iulia."

After Vladimir's discharge from the hospital, the County approved an increase to 265 hours per month that Plaintiff was paid to supervise and support Vladimir. Exh. KKK at 4; Exh. LLL, ECF No. 67-1 at 7. However, Plaintiff was traveling for five weeks that summer and only provided Vladimir with a few hours of care per week until she moved to Southern California to attend college in August 2015. Exh. B (Deposition of Kristina Matysik ("Kristina Dep.")), ECF No. 64-1 at 29:12-15, 37:25-38:9; Exh. AA, ECF No. 64-4 at 7 (Supplemental Response to Special Interrogatory No. 19).

Vladimir's native language was Russian; he spoke very little English. Johnson Dep. at 170:4-7, 175:8-11. Plaintiff, Iulia, and family friend Michael Pavlov ("Pavlov") state that before his arrest, Vladimir was able to maintain his own personal hygiene and go for walks in his neighborhood by himself. Kristina Dep. at 26:17-25, 28:12, 35:13-23; Iulia Dep. at 46:25-47:6; Exh. F (Deposition of Michael Pavlov ("Pavlov Dep.")), ECF No. 64-1 at 143:20-144:11. However, Plaintiff, Iulia, and Pavlov helped Vladimir remember to take his medications, bought groceries for him, sometimes cooked for him, did his laundry, and helped him keep his apartment clean. Kristina Dep. at 27:10-16, 28:6-10, 29:2-11; Iulia Dep. at 47:7-25, 54:14-25; Pavlov Dep. at 144:12-17, 145:14-146:6, 147:2-16. Iulia testified that Vladimir did not use public transportation. Iulia Dep. at 46:21-24.

As of October 14, 2015, Iulia reported to Vladimir's doctors that Vladimir recently began actively hallucinating and that his dementia was progressing. Exh. BB, ECF No. 64-4 at 14 (Dr.

Sukharev Progress Note). On October 23, 2015, Vladimir went to Stanford University's Center for Cancer Systems Biology ("CCSB") even though he had no appointment there. Exh. GG, ECF No. 64-4 at 64. A social worker who spoke with Vladimir recorded that Vladimir was confused, "able to identify himself by name but unable to recognize himself in an ID nor describe [] his age with certainty, nor his address nor describe any reason for presenting at CCSB." *Id.* Vladimir did not know his address or his family's whereabouts. *Id.* The social worker contacted Adult Protective Services and also contacted the San Jose Police Department to report a dependent adult without a caregiver. *Id.* The police eventually escorted Vladimir home after contacting Iulia. *Id.*

### 2. Events Leading to and Including Vladimir's Arrest

Although Vladimir was not always oriented to time or place due to his dementia, *see, e.g.*, ECF No. 64-1 at 124; ECF No. 64-4 at 64, he was generally able to walk several miles each day by himself in the neighborhood near his apartment. Iulia Decl. at ¶ 4. Vladimir used to belong to the Jewish Community Center ("JCC") in Los Gatos. *Id.* ¶ 3. Although Vladimir was no longer a member, he occasionally returned to the JCC during his walks. *Id.* In December 2014, Vladimir wandered into some upstairs offices at the JCC and frightened some JCC employees. Exh. A (Deposition of Los Gatos Police Department Officer Katherine Mann ("Mann Dep.")), ECF No. 64-1 at 13:5-11. Los Gatos police officers came to the JCC, advised Vladimir that he was no longer welcome at the JCC, and told Vladimir not to come back. *Id.* at 13:11-18.

On April 6, 2015, Vladimir was cited for trespassing at the JCC and released. Mann Dep. at 16:1-11; Exh. 1 at 1-3, Exh. 2. As a result, Vladimir was ordered to appear in court by June 18, 2015. Exh. 3. On October 18, 2015, the Superior Court issued a warrant for Vladimir's arrest after Vladimir failed the District Attorney's pretrial diversion program. Request for Judicial Notice, Exh. OOO, ECF No. 68-1 at 6-7.[3]

---

[3] Plaintiff and Defendants request judicial notice of several court filings and public records. *See* ECF Nos. 68, 70. The Court may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Public records, including judgments and other publicly filed documents, are proper subjects of judicial notice.

Case No. 16-CV-06223-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On October 26, 2015, Los Gatos Police Department Officer Bryan Paul responded to a welfare check that was initiated when a Starbucks customer observed Vladimir acting confused. The Starbucks customer asked a Starbucks employee to contact the police to check on Vladimir. Exh. 4; Exh. J (Deposition of Los Gatos Police Department Officer Bryan Paul ("Paul Dep.")), ECF No. 64-2 at 6:4-12. Upon running Vladimir's name, Officer Paul learned that there was a warrant for Vladimir's arrest. Paul Dep. at 6:14-19, 9:13-18, 9:21-10:3. Officer Paul then arrested Vladimir and booked Vladimir into Santa Clara County Main Jail. Exh. 4 at 2; Paul Dep. at 10:13-11:8.

### 3. Vladimir's Treatment While in Jail

Upon Vladimir's booking into Main Jail on October 26, 2015, an intake nurse evaluated Vladimir. Exh. II, ECF No. 65-1 at 2. The intake nurse noted that, per Officer Paul, Vladimir "seem[ed] to be confused" and the intake nurse recorded that Vladimir was "[f]ound to be talking to self, ha[d] flight of ideas, unable to get accurate medical history." *Id.* As a result, the intake nurse referred Vladimir for a mental health evaluation with a Russian-speaking marriage and family therapist. The therapist observed that Vladimir did not know his address, could name his wife but not how long they had been married, and thought that he had between ten and fifteen children. Exh. L, ECF No. 64-2 at 58. The therapist placed Vladimir on a 5150 hold due to grave disability. *Id.* at 59. Vladimir was then referred to Unit 8A, the jail's mental health unit. Exh. JJ, ECF No. 65-1 at 5. Upon Vladimir's admission to 8A, a nurse recorded that Vladimir was "confused," "d[id] not make sense," and was a "poor historian." Exh. KK, ECF No. 65-1 at 11.

On October 27, 2015, Dr. Farah Khan assessed Vladimir with the help of an interpreter. Exh. M (Deposition of Farah Khan, M.D. ("Khan Dep."), ECF No. 64-2 at 69:10-73:19, 92-93. Dr. Khan concluded that Vladimir might be suffering from dementia. *Id.* at 74:23-75:18. Because dementia is a neurological condition as opposed to psychiatric condition, Vladimir did not meet

---

*See, e.g.*, *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007). Accordingly, the Court grants both parties' requests for judicial notice.

Case No. 16-CV-06223-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

the criteria for a 5150 hold, which can only be based on a psychiatric condition.  *Id.* at 77:12-78:7;

Declaration of Alexander Chyorny, M.D. ("Chyorny Decl."), ECF No. 65 at ¶ 3.  Dr. Khan

consulted with Dr. Christopher Gunasekera the same day.  Khan Dep. at 78:14-18.  Dr.

Gunasekera scheduled Vladimir for a diagnostic workup for dementia for November 3, 2015.  On

October 27, 2015, Vladimir was discharged to Unit 2B, which is a special housing unit for inmates

with special needs.  Exh. MM, ECF No. 65-1 at 16; Exh. D (Deposition of Alexander Chyorny,

M.D. ("Chyorny Dep."), ECF No. 64-1 at 61:24-62:4.  While Vladimir was in 2B, deputies

conducted welfare checks on Vladimir every half-hour.  Declaration of Troy Beliveau ("Beliveau

Decl."), ECF No. 66 at ¶ 10; Exh. EEE, ECF No. 66-1 at 7-64 .

On November 1, 2015, Vladimir was referred back to 8A due to bizarre behavior,

including throwing trash in his toilet and sink, stating that he was 100 years old, and trying to call

his wife using a toothpaste tube as a telephone.  Exh. OO, ECF No. 65-1 at 20; Exh. PP, ECF No.

65-1 at 22.  As a result, Vladimir was again placed on a 5150 hold due to grave disability.  Exh.

PP, ECF No. 65-1 at 23.  Specifically, the therapist filling out the 5150 form noted that Vladimir

did not know where he was, could not follow directions, did not make sense, thought that he was

100 years old, and was unable to care for his basic needs.  *Id.*  The psychiatric nurse who admitted

Vladimir back into 8A noted that Vladimir did not understand where he was, what charges he was

facing, what day of the week it was, or how long he had been in jail.  Exh. QQ, ECF No. 65-1 at

30.  The nurse recorded Dr. Khan's assessment that Vladimir "doesn't present as [mental health]

inmate, but appears to have dementia, so [mental health medications] not effective."  *Id.* at 29.  On

November 2, 2015, Dr. Clayton Tamura assessed Vladimir with the help of an interpreter.  Exh. O

(Declaration of Clayton Tamura, M.D. ("Tamura Dep.")), ECF No. 64-2 at 123:12-124:2, 125:23-

126:5, 146.  Vladimir reported that he thought people were following him and requested

medication for paranoia.  *Id.*  Dr. Tamura prescribed Risperdal, an antipsychotic.  *Id.* at 134:17-

135:10.

On November 3, 2015, Dr. Khan again assessed Vladimir.  Exh. M at 83:24-85:14.  Dr.

Khan again determined that Vladimir did not meet the criteria for an involuntary hold because he did not have a psychiatric condition. *Id.* at 85:11-21 As a result, Vladimir was again discharged from 8A to 2B based on his diagnosis of dementia and need for assistance with activities of daily living. Exh. VV, ECF No. 65-2 at 18. Vladimir was due to see Dr. Gunasekera that day for the dementia workup, but the appointment was rescheduled to November 10, 2015 due to a facility lock-down caused by a power failure. Exh. UU, ECF No. 65-2 at 16; Beliveau Decl. ¶ 11; Exh. FFF. Vladimir refused his last dose of Risperdal before he was released. Chyorny Decl. ¶ 16; Exh. SS, ECF No. 65-2 at 9.

### 4. Vladimir's Family and Friend Attempt to Notify Jail of Vladimir's Condition and Obtain Information About His Release

Iulia realized that Vladimir was missing on October 26, 2015. At first, she tried to find him, including by contacting the Stanford medical center to which Vladimir had wandered earlier that week. *See* Exh. GG, ECF No. 64-4 at 64. After Iulia eventually learned that Vladimir was in jail, Iulia contacted the jail. Iulia testified that when she called the jail to learn Vladimir's status on the day that he was arrested, the staff person who answered the phone told her that Vladimir would be released before she could bail him out of jail. Exh. 18, ECF No. 72-18 at 23:1-4, 23:17-19, 24:21-23. Iulia said that the staff person also told her that it would take a week to run the background check that was necessary before she could visit Vladimir in jail. *Id.* at 23:4-7, 23:22-25, 27:12-22. Iulia states that she tried to inform the staff person that Vladimir needed to take certain medications, but the staff person ignored her. *Id.* at 23:22-24:3. Iulia states that she tried to contact the jail on several other occasions to inform them of Vladimir's need for medication, but she was told that she could not bring him medication. *Id.* at 26:7-17. Iulia also tried to convince the staff person that Vladimir should be transferred to the psychiatric unit, but the staff person responded, "'We know what we are doing,' and that's it." *Id.* at 24:9-11; *see also id.* at 26:17-27:1.

Pavlov testified that he called the jail at least ten times while Vladimir was in custody to try to gather information about Vladimir's case and release. Exh. 19, ECF No. 72-19 at 14:11-24,

United States District Court
Northern District of California

15:16-21, 16:8-10. Pavlov tried to explain to the staff members with whom he spoke that Vladimir "has [] mental conditions" and Pavlov also tried to "get information about [Vladimir's] condition . . . so it would be handled differently." *Id.* at 15:21-24, 17:7. Pavlov also attended each of Vladimir's court appearances and alerted Vladimir's public defender to Vladimir's dementia. *Id.* at 18:5-9, 19:10-20:1.

Although the jail's website contains a form that family members or friends can use to notify the jail of an inmate's medical conditions and prescriptions, neither Plaintiff, nor Iulia, nor Pavlov used the form to submit Vladimir's information. Exh. YY, ECF No. 65-2 at 29; Exh. AAA, ECF No. 65-3 at 2-4; Kristina Dep. at 36:6-22; Chyorny Dep. at 64:16-65:11; Exh. TTT, ECF No. 75-5 at 5:3-8. Iulia failed to do so even though she had recently worked at the jail as a psychiatric nurse in 8A and so was presumably familiar with the jail's policies. Iulia Dep. at 50:7-16; Exh. CC, ECF No. 64-4 at 18-19. In addition, neither Plaintiff nor Iulia called the phone number for reporting inmate mental health concerns that is listed on the jail's website. *See* Exh. YY, ECF No. 65-2 at 30; Exh. RRR, ECF No. 75-1 at 2-3 (Responses to Special Interrogatories Nos. 22 & 23).

On the morning of November 5, 2017, after a meeting between the deputy district attorney, Vladimir's public defender, Pavlov, and the judge, the case against Vladimir was dismissed in the interest of justice, and the Superior Court ordered Vladimir released. Exh. GGG, ECF No. 66-1 at 70; Exh. R, ECF No. 64-2 at 172:22-173:4, 173:20-24. The Superior Court did not include any conditions of release in the document that the court transmitted to the jail authorizing Vladimir's release. Exh. PPP, ECF No. 68-1 at 9. After the court dismissed Vladimir's case, the public defender told Pavlov to go to Main Jail to pick up Vladimir. Exh. S, ECF No. 64-2 at 180:2-11; Exh. 19 at 23:9-12.

Pavlov then went to Main Jail around noon on November 5, 2015. Exh. 19 at 25:1-2, 25:18-25. The deputy at the information window refused to tell Pavlov when Vladimir would be released. *Id.* at 25:3-11, 28:20-25. Pavlov testified that he tried to explain to the deputy that

8

Vladimir could not be released on his own because of his dementia. *Id.* at 26:6-10. Pavlov tried to provide his phone number to the deputy, and Pavlov asked to be notified when Vladimir was released. *Id.* at 26:10-13, 26:24-25, 27:2-7. However, the deputy informed Pavlov that he was not allowed to take any of Pavlov's information. *Id.* at 26:14-28:2. The deputy told Pavlov that all releases occur after 9:00 p.m. and that Vladimir would call Pavlov when he was released. *Id.* at 27:17-20, 29:16-22. Pavlov argued that Vladimir would be unable to call anyone on his own because of his dementia, but the deputy responded, "nothing we can do. It's our procedure. He is going to call you." *Id.* at 29:15-22. In contrast to Pavlov's account, the County states that the jail does not have a practice of releasing inmates around or after 9:00 p.m. Beliveau Decl. ¶ 13.

Pavlov then waited in front of Main Jail for at least three hours, but Vladimir was not released. Exh. 19 at 30:24-25. Pavlov went back inside the jail at about 3:00 p.m. and spoke with a different deputy. *Id.* at 31:3-13. Pavlov again tried to request that the jail contact him when Pavlov was released, and the deputy again refused. *Id.* at 32:1-9 ("If you are going to release him, he doesn't know what to do. Please take my information, put it on a note. It is so easy. Not trying to inconvenience those guys. Listen. It is so easy to put my phone number on the release papers. As soon as you are going to release him, just text me or call me. I am going to be nearby."). Because two deputies had told Pavlov that release would occur after 9:00 p.m., Pavlov decided to leave and come back later that night. *Id.* at 32:16-21.

Pavlov states that he then returned to Main Jail at 8:00 p.m. on November 5, 2015. *Id.* at 33:12-14. At some point between 8:00 and 9:00 p.m., Pavlov asked a different deputy when Vladimir would be released. *Id.* at 34:5-24. The deputy told Pavlov that Vladimir had already been released, even though Vladimir had not, in fact, been released.[4] *Id.* at 34:5-13. Pavlov then drove around the jail looking for Vladimir for at least thirty minutes but could not find him. *Id.* at

---

[4] The County suggests that if a deputy did give Pavlov incorrect information, this may have occurred because Pavlov had Vladimir's inmate identification number written down incorrectly. Mot. at 12 n.16. Vladimir's inmate identification number was EDK373. Beliveau Decl. ¶ 6. It is unclear from Pavlov's handwriting whether he recorded the number as "EDK373" or "EOK373." *See* Exh. DD, ECF No. 64-4 at 22.

Case No. 16-CV-06223-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

35:3-36:5.  Later that night, Pavlov went to Vladimir's apartment but Vladimir was not there.  *Id.* at 36:10-12.  Pavlov checked Vladimir's apartment again around 8:00 or 9:00 a.m. on November 6, 2015, but Vladimir was not there.  *Id.* at 37:3-13.  At that point, Pavlov and Iulia decided to report Vladimir as missing to the Los Gatos Police Department.  *Id.* at 38:22-39:8.

Contradicting his own account of events, Pavlov told the Los Gatos Police Department in the context of making the missing person report that Pavlov returned to the jail at 9:00 a.m. on November 6, 2015 and was told at that time that Vladimir had already been released.  Exh. 21 at 3-4.

Around the same time, at about 9:00 a.m. on November 6, 2015, Iulia called the County in-home support services program to inquire about the status of Plaintiff's checks for allegedly providing supervision and support for Vladimir, but Iulia did not inform the County that Vladimir had been in jail or that Plaintiff had moved to Southern California and was no longer providing Vladimir with protective supervision.  Declaration of James Ramoni, ECF No. 67 at ¶ 7; Exh. LLL at 8.

Neither Iulia nor Pavlov knew the names or could remember physical descriptions of the jail staff members with whom they spoke, and Plaintiff apparently did not pursue discovery to learn the identities of these staff members.  *See* Exh. 18 at 23:15-16, 24:24-5; Exh. 19, ECF 72-19 at 11:17-25, 16:11-13, 25:12-15, 31:9-16; Mot. at 18 n.22.

Iulia also testified that she told Pavlov to tell the court that Vladimir should not be released except to Pavlov or to her.  Exh. 18 at 30:6-25.  Iulia thought that Vladimir had given her phone number to the court clerk so that she could be contacted when Vladimir was released.  *Id.*

**5.  Vladimir's Release and Death**

As stated above, on the morning of November 5, 2017, the case against Vladimir was dismissed in the interest of justice, and the Superior Court ordered Vladimir released.  Exh. GGG, ECF No. 66-1 at 70.  The Superior Court did not include any conditions of release in the document that the court transmitted to the jail authorizing Vladimir's release.  Exh. PPP; Exh. R at 20:22-

United States District Court
Northern District of California

21:4.  The release officer at Main Jail received the paperwork authorizing Vladimir's release at approximately 3:55 p.m. on November 5, 2015.  Exh. III, ECF No. 66-1 at 74.  Because Vladimir's property was not provided to the day shift release officer in time to release Vladimir during the day, Vladimir's release was transferred to the night shift release officer.  Exh. U (Deposition of Lucero Lindemann ("Lindemann Dep."), ECF No. 64-3 at 17:11-18:3, 19:22-20:12, 30.

When infirmary nurse Leo Rosario learned that Vladimir would be released at night, Rosario asked Vladimir whether he had anywhere to go.  Exh. V (Deposition of Leo Rosario ("Rosario Dep.")), ECF No. 64-3 at 43:3-7.  Vladimir responded that he did not and that he lived under a bridge.  *Id.* at 43:8, 43:17-19.  Believing Vladimir to be homeless, Rosario requested that Vladimir be held overnight for a daylight release because Vladimir had nowhere to go.  *Id.* at 43:8-10, 49-50.

Vladimir was released shortly before 8:00 a.m. on November 6, 2015 with the assistance of a Russian-speaking deputy.  Lindemann Dep. at 21:24-22:6, 29:17-21, 30.  The release officer on duty at that time, Lucero Lindemann, testified that he did not have access to Vladimir's diagnosis or medical records because he was not on the medical staff.  *Id.* at 25:12-26:4.

After his release, Vladimir remained near Main Jail for six hours.  Exh. FF, ECF No. 64-4 at 54-55.  At about 6:00 p.m., nearly ten hours after Vladimir was released from Main Jail and after darkness fell, Vladimir wandered onto Interstate 880 near Dixon Landing Road in Milpitas, almost nine miles from Main Jail and in the opposite direction from his home.  Exh. QQQ, ECF No. 68-1 at 19-20.  Iulia declared that Vladimir did not have a previous history of disobeying traffic rules and signals, walking in the street, or attempting to cross a highway or freeway against traffic.  Iulia Decl. ¶ 4.

Choi, who was illegally driving in the carpool lane, struck Vladimir after Vladimir suddenly entered the carpool lane from the right.  Vladimir died at the scene.  Exh. X, ECF No. 64-3 at 76:5-13, 77-79; Exh. QQQ at 24.  Choi exited the freeway at the next exit because she was

afraid of being struck by other high-speed traffic on the freeway.  After speaking with her uncle, Choi drove to her uncle's house and then called 911 to report the accident.  Exh. QQQ.

**B.      Procedural History**

Plaintiff filed a complaint against Defendants in Santa Clara County Superior Court on August 15, 2016.  ECF No. 2-1.  Count One of Plaintiff's state court complaint alleged negligence against all Defendants.  *Id.* ¶¶ 30-35.  Count Two alleged negligence per se against all Defendants.  *Id.* ¶¶ 36-41.  Count Three alleged wrongful death against all Defendants.  *Id.* ¶¶ 42-46.  Count Four alleged violation of 42 U.S.C. § 1983 against Smith.  *Id.* ¶¶ 47-50.

On October 27, 2016, Defendants removed Plaintiff's state court complaint from the Santa Clara County Superior Court to this Court, and asserted that this Court had federal question jurisdiction under 28 U.S.C. § 1331.  ECF No. 2.

On November 2, 2016, the County and Smith filed a motion to dismiss the Complaint.  ECF No. 13.  Specifically, the County asserted that Plaintiff's state law claims must be dismissed because the County and its employees were immune under state law.  *Id.* at 3-7.  Further, the County and Smith moved to dismiss Plaintiff's § 1983 claim against Smith, and argued that Plaintiff had failed to allege sufficient facts to state a claim for relief.  *Id.* at 8.

Rather than oppose the motion to dismiss, Plaintiff filed on November 16, 2016, a First Amended Complaint.  *See* ECF No. 15.  Plaintiff's First Amended Complaint alleged six causes of action.

Count One, brought on behalf of Vladimir's estate, alleged a cause of action under 42 U.S.C. § 1983 against Smith in her individual capacity.  *Id.* ¶¶ 29-33.

Count Two, brought on Plaintiff's own behalf, alleged a cause of action under § 1983 against Smith in her individual capacity.  *Id.* ¶¶ 34-38.

Count Three, brought on Plaintiff's own behalf and on behalf of Vladimir's estate, alleged a cause of action under § 1983 against Smith in her official capacity and the County based on *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  *Id.* ¶¶ 39-43.

United States District Court
Northern District of California

Count Four, brought on behalf of Vladimir's estate, alleged a cause of action under California Government Code § 820 and was brought against Smith in her individual capacity. *Id.* ¶¶ 44-51.

Count Five, brought by Plaintiff on her own behalf, alleged a violation of California Government Code §§ 815.2 and 820 against the County. *Id.* ¶¶ 52-59.

Finally, Count Six, brought by Plaintiff on her own behalf, alleged a negligence cause of action against Choi. *Id.* ¶¶ 60-64.

Because Plaintiff filed a First Amended Complaint, this Court denied as moot the County and Smith's motion to dismiss Plaintiff's original complaint on November 16, 2016. ECF No. 16.

On November 18, 2016, the County and Smith filed a motion to dismiss in part Plaintiff's First Amended Complaint. See ECF No. 18. Specifically, Defendants moved to dismiss only Count Four of Plaintiff's First Amended Complaint. *See id.* On December 14, 2016, Plaintiff filed a response in opposition. ECF No. 20. On December 21, 2016, Defendants filed a Reply. ECF No. 21. On February 8, 2017, the Court dismissed Count Four with leave to amend. ECF No. 29. Plaintiff did not amend Count Four.

On April 25, 2017, the County and Smith answered the First Amended Complaint. ECF No. 37.

On November 2, 2017, the Court granted the parties' stipulation to dismiss Plaintiff's claims against Choi with prejudice. ECF No. 60. As a result, only Counts One, Two, Three, and Five remain.

On November 17, 2017, the County and Smith filed the instant Motion for Summary Judgment. ECF No. 63 ("Mot."). On December 1, 2017, Plaintiff filed an Opposition. ECF No. 69 ("Opp'n"). On December 8, 2017, the County and Smith filed a Reply. ECF No. 74 ("Reply").

## II.     LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that

United States District Court
Northern District of California

1    there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as

2    a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of

3    the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a

4    material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

5    the nonmoving party.  *See id.*

6          The party moving for summary judgment bears the initial burden of identifying those

7    portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine

8    issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party

9    meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own

10   affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial."

11   Fed. R. Civ. P. 56(e).  If the nonmoving party fails to make this showing, "the moving party is

12   entitled to judgment as a matter of law."  *Celotex Corp.*, 477 U.S. at 323.

13         At the summary judgment stage, the Court must view the evidence in the light most

14   favorable to the nonmoving party: if evidence produced by the moving party conflicts with

15   evidence produced by the nonmoving party, the judge must assume the truth of the evidence set

16   forth by the nonmoving party with respect to that fact.  *See Leslie v. Grupo ICA*, 198 F.3d 1152,

17   1158 (9th Cir. 1999).

18   **III.    DISCUSSION**

19         The Court first addresses Counts One and Two, which Plaintiff asserts under 42 U.S.C.

20   § 1983 against Smith in her individual capacity.  The Court then addresses Count Three, which

21   Plaintiff asserts under 42 U.S.C. § 1983 against Smith in her official capacity and against the

22   County based on *Monell*, 436 U.S. 658.  The Court then addresses Count Five, which Plaintiff

23   brings pursuant to California Government Code §§ 815.2 and 820 against the County.

24   **A.      42 U.S.C. § 1983 Claims Against Smith in Her Individual Capacity**

25          **1.      Applicable Law**

26          "To succeed on a § 1983 claim, a plaintiff must show that (1) the conduct complained of

27                                                      14

28   Case No. 16-CV-06223-LHK
     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY
     JUDGMENT

was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011). Here, there is no dispute that Smith acted under color of state law. Thus, the only issue is whether Smith deprived Vladimir or Plaintiff of a federally protected right.

"[T]he general rule is that [a] state is not liable for its omissions." *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000). "In that vein, the Fourteenth Amendment's Due Process Clause generally does not confer any affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests." *Patel*, 648 F.3d at 971 (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989)). However, "[t]here are two exceptions to this rule: (1) when a 'special relationship' exists between the plaintiff and the state (the special-relationship exception); and (2) when the state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known or obvious danger' (the state-created danger exception)." *Id.* at 971-72 (citations omitted). "If either exception applies, a state's omission or failure to protect may give rise to a § 1983 claim." *Id.* at 972.

The special-relationship exception applies "when a state 'takes a person into its custody and holds him there against his will.'" *Id.* at 972 (quoting *DeShaney*, 489 U.S. at 199-200). Deliberate indifference to a prisoner's serious medical or safety needs while the prisoner is in custody violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1248 (9th Cir. 2016). However, a pretrial detainee's claims alleging deliberate indifference to medical or safety needs arise under the Fourteenth Amendment's Due Process Clause. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1067-68 (9th Cir. 2016) (en banc).

The state-created danger exception applies when two requirements are met: (1) "where there is affirmative conduct on the part of the state in placing the plaintiff in danger," and (2) "where the state acts with deliberate indifference to a known or obvious danger." *Patel*, 648 F.3d

15

at 974 (internal quotation marks omitted).  For example, in *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997), Penilla became seriously ill while sitting on his front porch.  *Id.* at 708.  The first responders to a 911 call were two police officers who examined Penilla, moved him inside the house, locked the door, canceled the request for paramedics, and left.  *Id.*  The Ninth Circuit found that there was a question of material fact about whether the state-created danger exception applied and allowed the case to go to trial.  *Id.* at 710-11.  As another example, in *Wood v. Ostrander*, 879 F.2d 583, 590 (9th Cir. 1989), the Ninth Circuit held that a state trooper affirmatively placed a car passenger in danger by arresting the intoxicated driver, impounding the vehicle, and abandoning the passenger in a high-crime area.

"[T]here is no respondeat superior liability under section 1983."  *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002).  However, a plaintiff may state a claim under § 1983 against a supervisor for deliberate indifference.  *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011).  "A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  *Id.* at 1207 (citation omitted).  "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others."  *Id.* at 1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)).  "The requisite causal connection can be established . . . by setting in motion a series of acts by others, or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury."  *Id.* at 1207-08 (internal quotation marks and citations omitted) (alterations in original).

### 2.  Analysis

Count One, which Plaintiff brings on behalf of Vladimir's estate,[5] alleges that Smith

---

[5] Although Defendants initially challenged Plaintiff's standing to bring § 1983 claims on behalf of

Case No. 16-CV-06223-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

caused Vladimir to be denied necessary medical care while in custody and caused Vladimir "to be released without supervision or notification when he was unable to provide for his safety." First Amended Complaint ¶ 30. Plaintiff alleges in relevant part that these actions deprived Vladimir of his 14th Amendment due process rights. *Id.* ¶ 31. Count Two, which Plaintiff asserts on her own behalf, alleges that the same actions—denying Vladimir necessary medical care and causing Vladimir to be released without supervision or notification—violated Plaintiff's 14th Amendment liberty interest in maintaining family relationships. *Id.* ¶ 37. In both Counts, Plaintiff alleges that Smith acted with deliberate indifference to Vladimir's and Plaintiff's clearly established rights. *Id.* ¶¶ 32, 37. In Plaintiff's Opposition, Plaintiff relies only on Vladimir's release without a discharge plan, transportation to a medical facility, or notification to any of his caretakers to support her claims, thereby abandoning any reliance on the alleged failure to provide adequate medical care. *See* Opp'n at 13-17.

Smith contends that she is entitled to summary judgment on Counts One and Two because Plaintiff failed to identify any deliberately indifferent conduct by Smith. Mot. at 21. Specifically, Smith argues that she had no knowledge of or involvement in any decision related to Vladimir's incarceration, medical treatment, or release. *Id.* In support of this argument, Smith cites her deposition, in which she testified that she was unaware that Vladimir was held in custody at Main Jail, unaware of the circumstances of Vladimir's death, and unaware of any investigation that the Sheriff's Office or any other office may have conducted into Vladimir's death. *Id.* (citing Exh. T at 6:8-7:9). Accordingly, Smith has satisfied her burden to identify evidence that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The burden thus shifts to the Plaintiff to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex Corp.*, 477 U.S. at 323.

In response, Plaintiff discusses the actions of a range of named and unnamed jail staff

---

Vladimir's estate, *see* Mot. 13 & n.18-19, Defendants in their Reply conceded for the purposes of the instant motion that Plaintiff had standing, *see* Reply at 1 n.1.

Case No. 16-CV-06223-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

members during Vladimir's incarceration. *See* Opp'n at 2-18 (describing actions of Therapist Tasya Bychkova, Dr. Farah Khan, Dr. Alexander Chyorny, Therapist Anna Lomovskaya, Dr. Clayton Tamura, Social Worker Michael Mann Stock, Registered Nurse Marilen Bagunas, Nurse Leo Rosario, and several unnamed Sheriff's Deputies), 22-24 (referring generally to the actions of "the correctional deputies and custody medical staff"). Plaintiff appears to refer to all of these jail staff members collectively as "Defendants" throughout the legal argument section of her Opposition. *See, e.g.*, *id.* at 14 (arguing, for example, that "Defendants were well aware of Vladimir's serious mental impairment" and "Defendants exposed Vladimir to a substantial risk of serious harm by releasing him on his own to fend for himself in the streets"). However, none of these staff members are named as defendants. Smith is the only individual named as a defendant in Plaintiff's remaining claims, yet Plaintiff fails to identify any specific action that Smith took related to Vladimir's incarceration or release. *See id.* at 2-18. Nor does Plaintiff identify any evidence that Smith failed to train, supervise, or control her subordinates, acquiesced in any of her subordinates' actions, or showed a reckless or callous indifference to Vladimir's or Plaintiff's rights. *See Starr*, 652 F.3d at 1208. Given the total lack of evidence that Smith "personally played a role in the alleged constitutional violations, either directly or by acquiescence or culpable indifference, there is no basis for liability against [her] in [her] individual capacit[y]" based on her personal involvement in Vladimir's detention or release. *Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005). Accordingly, the Court GRANTS Defendants' motion for summary judgment as to Counts One and Two.

**B.     *Monell* Claim Against the County and Smith in Her Official Capacity**

   **1.     Applicable Law**

   Under § 1983, a local government may not be sued under a theory of respondeat superior for injuries inflicted by its employees or agents. *Monell*, 436 U.S. at 690-91. However, "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy

statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690-91. Specifically, "to establish liability for governmental entities under *Monell*, a plaintiff must prove '(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation.'" *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quoting *Plumeau v. Sch. Dist. No. 40 Cty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997) (alterations in original)).

Moreover, "[u]nder *Monell*, a local government body can be held liable under § 1983 for policies of inaction as well as policies of action." *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014). "A policy of action is one in which the government body itself violates someone's constitutional rights, or instructs its employees to do so; a policy of inaction is based on a government body's 'failure to implement procedural safeguards to prevent constitutional violations.'" *Id.* (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012)). "In inaction cases, the plaintiff must show, first, 'that [the] policy amounts to deliberate indifference to the plaintiff's constitutional right.'" *Id.* (quoting *Tsao*, 698 F.3d at 1143) (alteration in original). "This requires showing that the defendant 'was on actual or constructive notice that its omission would likely result in a constitutional violation.'" *Id.* (quoting *Tsao*, 698 F.3d at 1145). Second, the plaintiff must show 'that the policy caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy.'" *Id.* (quoting *Tsao*, 698 F.3d at 1143).

In the absence of a formal policy, a plaintiff could base a *Monell* claim on "a longstanding practice or custom which constitutes the standard operating procedure of the local government entity." *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying

19

out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). However, with respect to an adopted municipal policy, a single incident can serve as the basis of a *Monell* claim so long as "proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

Finally, in addition to establishing that a custom or policy attributable to the municipality caused his injury, "[a] plaintiff must also demonstrate that the custom or policy was adhered to with 'deliberate indifference to the constitutional rights of [the jail's] inhabitants.'" *Castro*, 833 F.3d at 1076 (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)). The deliberate indifference inquiry for a municipality is an objective inquiry. *Id.* The Ninth Circuit has stated that "[w]hether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury." *Lee*, 250 F.3d at 682.

### 2. Analysis

"The Ninth Circuit has held that a lack of affirmative policies or procedures to guide employees can amount to deliberate indifference even when other general policies are in place." *Claypole v. County of San Mateo*, No. 14-cv-2730-BLF, 2016 WL 127450, at *11 (N.D. Cal. Jan. 12, 2016). "[W]hen the need to remedy the omission is so obvious, and the inadequacy is so likely to result in the violation of constitutional rights, . . . the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* (quoting *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175 (9th Cir. 2002), *overruled on other grounds by Castro*, 833 F.3d 1060) (internal quotation marks omitted) (alterations in original). For example, in *Long v. County of Los Angeles*, 442 F.3d 1178, 1190 (9th Cir. 2006), an elderly man suffering from congestive heart failure reported to the county jail to serve a four-month sentence. During the next several weeks, the inmate received uncoordinated and inadequate care and ultimately died. The Ninth Circuit held that the plaintiff had raised a triable issue regarding whether the county's failure to institute several policies amounted to deliberate indifference to the inmate's constitutional rights. *Id.*; *see*

United States District Court
Northern District of California

*also Oviatt v. Pearce*, 954 F.2d 1470, 1477-78 (9th Cir. 1992) (upholding a jury verdict based on a sheriff's refusal to create a procedure to remedy the problem of untimely arraignments).

In *Gibson*, 290 F.3d 1175, a man who had manic depressive disorder was arrested during one of his manic phases. *Id.* at 1180. Although the jail medical staff noted that the detainee had psychotropic medications with him at the time of his arrest, the jail medical staff did not act on this information. *Id.* at 1182-83. The detainee was combative and difficult to control. Eventually, the detainee suffered a heart attack and died while several deputies were trying to restrain him. *Id.* The County of Washoe had policies requiring arresting officers to give the jail medical staff any prescription medications found with an incoming detainee. *Id.* at 1195. The policy also required the jail medical staff to secure the medication in the infirmary or in "secured property," but the policy did not require the jail medical staff to "act on any information that the medication might bear." *Id.* The policy also precluded medical evaluations of detainees who were uncooperative, combative, or intoxicated. *Id.* The Ninth Circuit held that there was a dispute of material fact as to whether the policy's failure to require the jail medical staff to act on information that they learned from a detainee's prescriptions caused the detainee's death. *Id.* at 1195-96.

Similarly, in *Claypole*, 2016 WL 127450 at *12, a court in this district found that there was a dispute of material fact as to whether the County of San Mateo's lack of procedures for the psychiatric screening of inmates constituted deliberate indifference. In *Claypole*, the decedent was arrested in San Mateo County and booked into a San Mateo County jail. The arresting officer characterized the decedent as confused and incoherent. *Id.* at *1. There was no county policy requiring inmates to be screened for mental health issues by a medical professional. Instead, a police service technician performed medical screening on the decedent. *Id.* at *2. The decedent was later released from the San Mateo County jail and later was arrested in Monterey County and booked into a Monterey County jail, where he committed suicide. *Id.* at *2-3. Plaintiff argued that the screening that was performed in the San Mateo County jail was perfunctory and that the County's lack of a policy requiring screening by a medical professional and lack of a policy

United States District Court
Northern District of California

requiring transmission of a detainee's mental health information to the next custodian amounted to deliberate indifference. *Id.* at *11. The court found that these issues "must be resolved by a jury." *Id.* at *12.

It is perhaps unusual to find a viable *Monell* claim based on deliberate indifference when Plaintiff has not named as defendants any individual jail employee involved in Vladimir's treatment or release. But as the Seventh Circuit explained in an analogous case, "unusual does not mean impossible, and this case well illustrates why an organization might be liable even if its individual agents are not." *Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 378 (7th Cir. 2017) (en banc). "Without the full picture, each person might think that her decisions were an appropriate response to the problem; her failure to situate the [actions] within a broader context could be at worst negligent, or even grossly negligent, but not deliberately indifferent. But if institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible." *Id.* Similarly, the Ninth Circuit has explained that "[i]f a plaintiff establishes he suffered a constitutional injury *by the City*, the fact that individual officers are exonerated is immaterial to liability under § 1983." *Tsao*, 698 F.3d at 1142 (emphasis and alteration in original) (quoting *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002)).

Here, Plaintiff alleges that Defendants "have a policy of inaction regarding the release of mentally disabled or mentally impaired inmates, or inmates with dementia." Opp'n at 21. Specifically, Plaintiff identifies a host of policies that Defendants do not have. According to Plaintiff, Defendants do not require jail staff to assess an inmate's fitness for release "on his own to the streets"; to assess whether an inmate needs transportation to his home, a shelter, or a hospital; or to assess whether an inmate must wait in the lobby for a caretaker. *Id.* Specifically, "[t]he medical staff are not typically notified that an inmate is being released, and there is no requirement that the medical staff take any steps to ensure that severely mentally disabled inmates are not released on their own to the streets." *Id.* at 22. Defendants also do not require the jail staff to "make[] an effort to inform the court" if an "inmate is not of sound mind to be released on his

own." *Id.* In addition, there is no policy requiring the jail to inform friends or family of a mentally disabled inmate that he is being released—"in fact, there is a policy against it." *Id.*

The Court concludes that Plaintiff has raised a dispute of material fact about whether Defendants' failure to implement such policies amounted to deliberate indifference to Vladimir's constitutional rights. First, Plaintiff has raised a triable issue as to whether Vladimir "possessed a constitutional right of which he was deprived." *Dougherty*, 654 F.3d at 900. A reasonable jury could conclude that releasing Vladimir—who did not speak English, did not know his own age or his own address, and who recently mistook a toothpaste tube for a telephone, among other signs of dementia—onto the street without supervision, without alerting his caretakers, or without providing him a means of transportation, constituted deliberate indifference to a severe safety need. *See Wakefield v. Thompson*, 177 F.3d 1160, 1164 (9th Cir. 1999) (requiring prisons to provide prisoners with transitional supply of medication upon release based on the recognition that "as a matter of common sense" that "a prisoner's ability to secure medication 'on his own behalf' is not necessarily restored the instant he walks through the prison gates and into the civilian world"); *United States v. County of Los Angeles*, No. CV 15-5903 DDP (JEMx), 2016 WL 2885855, at *5 (C.D. Cal. May 17, 2016) (citing *Wakefield* in a case about the necessity of discharge planning for inmates with dementia, among other disabilities, for the proposition that "Defendants presumably do not, and could not, for example, simply show a severely ill inmate to an exit without any concern for what might befall that inmate on the other side of the door.").

Second, there is evidence from which a jury could conclude that Defendants' failure to adopt policies requiring greater coordination related to the release of mentally disabled inmates amounted to a policy or custom of inaction and that such policy or custom amounted to deliberate indifference. *See Dougherty*, 654 F.3d 900. Specifically, the Adult Custody Health Services policy on individualized treatment plans recognized that patients who are (1) 60 years or older, or (2) have dementia are more likely to require the coordinated care of a multidisciplinary team. Exh. XX, ECF No. 65-2 at 26-27. Dr. Chyorny, the Medical Director of the Santa Clara Valley

Health and Hospital System's Adult Custody Health Services, testified that discharge planning for an inmate with dementia who had been at the jail for a long enough period of time would typically involve "figuring out what's the best place for them to go, and that would be trying to see whether they would be going home or institutionalized." Chyorny Dep. at 73:20-22; Chyorny Decl. ¶ 2. In addition, Dr. Chyorny testified that there was a taxi voucher system in which the jail provides taxi vouchers to inmates who need to "get to a certain place and they have no means of getting there, you know, meaning that there's nobody to pick them up or they cannot navigate the bus system." Chyorny Dep. at 83:14-17. According to Dr. Chyorny, the determination of need for a taxi voucher usually occurs "in the process of multi-disciplinary meetings and planning." *Id.* at 83:19-20. A jury could conclude that this evidence showed that jail policymakers realized both that patients with dementia are likely to need a coordinated, multidisciplinary approach to care and that discharge—and specifically, transportation to a place of shelter after discharge—represented an important part of providing for inmates with dementia.

However, there is also evidence that whether an inmate actually received discharge planning services, including a taxi voucher, depended on a host of random variables, such as whether the nurse on duty at the time of the release was familiar with the inmate. In addition, there is evidence that mentally ill inmates often did not receive such services. Such evidence includes the following passage from Dr. Chyorny's deposition:

> Q: All right. Let's say someone is on 2C with a severe form of dementia and they are being released, so my understanding is that an officer would inform the nurse that he's being released. What would a nurse do if she was releasing an inmate housed on 2C with a severe form of dementia?

> The Witness: And I would have to say it's really – again, it depends. It depends on the nurse knowing that somebody has a severe form of dementia. It depends on the nurse knowing collateral information about whether the person has a place to go or doesn't have a place to go. It depends on whether the nurse believes that the patient will have difficulty navigating their way home. So there are different scenarios, and there are different things that could potentially be done. Every case is different.

> Q: What kind of information – so speaking about that nurse that would make this

24

determination, what information is available to her or him?

The Witness: Could you rephrase the question?

Q: Yeah. Are there charts, or is there a database or something that the nurse would look at prior to determining the discharge plan or what they are going to do with that inmate upon release?

The Witness: I'm not sure what you mean by discharge planner. We don't have discharge planners per se. We have a discharge planning process. So a nurse has access to the medical chart. That's about it as far as what they have access to.

Q: Does that have contact information on it as far as an address or phone number?

A: Generally not, no. I mean if one really wants to try and get the information, he could check on another system, the Offender Management system. There's – but for most of our patients, that information is missing.

*Id.* at 78:5-79:24 (objections omitted). In other words, the jail had no systematic way of ensuring that the staff member who determines the circumstances of an inmate's release have access to the relevant information about that inmate's needs.

In addition, Plaintiff identified the 2016 Santa Clara County Civil Grand Jury Report, which found that as of May 2016, only one multidisciplinary team—which Dr. Chyorny identified as the group that would assemble discharge plans—had "been formed to augment services provided to inmates housed in Main Jail 8A, the inpatient psychiatric facility. . . . No other [multidisciplinary teams] have been created to serve the mental health needs of inmates elsewhere in the jail facilities." ECF No. 70-1 at 19. Moreover, the Grand Jury specifically found that "Custody Health Services is unable to facilitate a 'warm handoff' of mentally ill inmates to community providers upon release from jail" and that "[i]mplementation of multi-disciplinary teams . . . has been poorly executed, and the proposed benefits have not been realized." *Id.* at 22. Although the Grand Jury Report postdates Vladimir's death, a reasonable jury could infer that the conditions it found in May 2016 also existed in November 2015.

Thus, there is evidence that despite realizing the importance of coordinated care and discharge planning for patients with dementia, the jail had no policy to ensure that such patients actually received discharge plans or that the staff involved in discharging such patients had access

25

to all of the relevant information about the patients whom they were discharging. Such evidence could also support a finding of deliberate indifference. *See Long*, 442 F.3d at 1190 (finding a triable issue on whether failure to implement certain policies amounted to deliberate indifference); *Claypole*, 2016 WL 127450 at \*11-12 (same). To again quote *Glisson*, the Constitution does not require the jail to adopt any particular set of policies, "[b]ut the Constitution does require it to ensure that a well-recognized risk for a defined class of prisoners not be deliberately left to happenstance." *Glisson*, 849 F.3d at 382.

Defendants argue that "Plaintiff bases her *Monell* claim on the single incident involving her father's release from jail." Reply at 11. According to Defendants, "[w]ithout evidence of a pattern of constitutional violations stemming from a policy of inaction, Plaintiff's *Monell* claim fails." *Id.* at 12. Defendants misstate the law. Although a custom claim must be founded upon "practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy," *Trevino*, 99 F.3d at 918, and failure-to-train claims typically require a pattern of violations, *see Tsao*, 698 F.3d at 1145, there is no requirement that the challenged policy or practice of inaction result in a pattern of constitutional violations. *See Glisson*, 849 F.3d at 381 ("Notably, neither the Supreme Court in *Harris*, nor the Ninth Circuit, nor the Third Circuit, said that institutional liability was possible only if the record reflected numerous examples of the constitutional violation in question."). "There is no magic number of injuries that must occur before [a] failure to act can be considered deliberately indifferent." *Id.*; *accord Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409-10 (1997) (stating that a single constitutional injury may suffice where the injury is "a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations"). Indeed, in *Long*, 442 F.3d 1178, in which there is no mention of any other constitutional violations, the Ninth Circuit found a triable issue as to whether the lack of certain policies amounted to deliberate indifference. *Id.* at 1190.

Finally, Plaintiff has raised a triable issue as to whether the alleged policy or practice of

failing to require better coordination of the release of inmates with dementia was the moving force behind Vladimir's allegedly unsafe release and death. A policy is the moving force behind a constitutional violation if it caused the violation. *Tuttle,* 471 U.S. at 823. "Pointing to a municipal policy action or inaction as a 'but-for' cause is not enough to prove a causal connection under *Monell.* Rather, the policy must be the proximate cause of the section 1983 injury." *Van Ort v. Estate of Stanewich,* 92 F.3d 831, 837, (9th Cir.1996) (citations omitted). "In § 1983 actions, '[t]raditional tort law defines intervening causes that break the chain of proximate causation.'" *Claypole*, 2016 WL 127450 at *10 (quoting *Van Ort*, 92 F.3d at 837). "A defendant's conduct is not the proximate cause of the plaintiff's injury 'if another cause intervenes and supersedes his liability for the subsequent events.'" *Id.* (quoting *White v. Roper*, 901 F.2d 1501, 1506 (9th Cir. 1990)). "However, foreseeable intervening causes . . . will not supersede the defendant's responsibility." *Id.* (quoting *Conn v. City of Reno*, 591 F.3d 1081, 1101 (9th Cir. 2010) (en banc), *vacated by City of Reno v. Conn*, 563 U.S. 915 (2011), *and reinstated in relevant part by Conn v. City of Reno*, 658 F.3d 897 (9th Cir. 2011)) (internal quotation marks omitted). "If reasonable persons could differ over the question of foreseeability, summary judgment is inappropriate and the question should be left to the jury." *Id.* (quoting *Conn*, 591 F.3d at 1101).

Here, Leo Rosario, the nurse who requested that Vladimir be held overnight, testified that he did not review Vladimir's medical records before determining the timing of Vladimir's release. Rosario Dep., ECF No. 64-3 at 44:23-45:11. Indeed, Rosario stated that he did not know that Vladimir had been diagnosed with dementia. *Id.* at 44:9-13. Deputy Lindemann, the release officer who processed Vladimir's release, also stated that he had no access to information about inmates' diagnoses or social circumstances. Lindemann Dep. at 25:12-26:4.

Thus, just as Dr. Chyorny explained was typically the case, the timing and conditions of Vladimir's release were determined by jail employees who had extremely limited information about Vladimir's diagnosis, symptoms, history of treatment in the jail, and social situation, even though the jail's own records may have alerted these staff members of the danger of releasing

Case No. 16-CV-06223-LHK
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Vladimir on his own. A reasonable jury could conclude that a policy requiring a more coordinated release procedure for inmates that have been identified as severely mentally disabled—especially those whose caretakers had attempted to coordinate release with the jail—would have prevented Vladimir's allegedly unsafe release and death. A reasonable jury could also conclude that it was reasonably foreseeable that an inmate with dementia who was released with no supervision, transportation, or coordination with his caregivers would be exposed to a high risk of injury. While a jury might find that Vladimir's wandering onto 880 ten hours after his release from Main Jail was an unforeseeable intervening cause of his death, a jury could also find that it was foreseeable that a man with dementia who had spent ten hours wandering in an unfamiliar part of the city would at some point wander onto a busy road. As such, Defendants' motion for summary judgment on Count Three is DENIED.

### C.  Cal. Gov. Code §§ 815.2 and 820 Claims Against the County

Section 815.2 of the California Government Code provides that "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." However, § 844.6 immunizes public entities from liability for "[a]n injury to any prisoner." Cal. Gov. Code § 844.6(a)(2). There is a limited exception to § 844.6 that requires public entities to pay judgments based on malpractice against public employees practicing "one of the healing arts." *Id.* § 844.6(d). There is also a limited exception codified in § 845.6, which states that a public entity can be liable if an employee acting within the scope of his employment "knows or has reason to know that [a] prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." Finally, § 855.6 immunizes public entities from liability for injuries "caused by the failure to make a physical or mental examination, or an adequate physical or mental examination, of any person for the purpose of identifying a condition that would constitute a hazard to the health and safety of the individual or others," except for an examination

United States District Court
Northern District of California

or diagnosis for the purpose of treatment. This immunity is also subject to an exception for failure to provide medical care to a person in obvious need of such care. *Lucas v. City of Long Beach*, 131 Cal. Rptr. 470, 475 (Ct. App. 1976).

To state a claim under § 845.6, "a prisoner must establish three elements: (1) the public employee knew or had reason to know of the need (2) for immediate medical care, and (3) failed to reasonably summon such care." *M. H. v. County of Alameda*, 62 F. Supp. 3d 1049, 1099 (N.D. Cal. 2014) (citation omitted). Plaintiff argues that Vladimir had an obvious need for medical care at the time of his release based on his diagnosis of dementia, his disorientation, and his inability to care for himself. Opp'n at 24-25. However, Plaintiff does not specify what kind of medical care Vladimir needed. *Id.* She does not argue that he needed any type of medication, procedure, or medical evaluation. Indeed, the undisputed facts show that there is little to be done for dementia patients from a medical perspective. Dr. Chyorny testified that "[t]he treatment of mild dementia is not pharmacological. It's usually just education and supportive. And in general treatment of dementia, there's very few things that could be done to treat dementia per se, so what you do is you help people adapt to their environment." ECF No. 64-1 at 66:20-25. Similarly, Dr. Perry testified that, other than prescribing Aricept, a medicine that slightly improves cognitive function, *id.* at 118:22-25, Dr. Perry's treatment plan for Vladimir consisted mostly of discussing needed help or services, *id.* at 114:5-11. Dr. Perry explained that "[d]epending on the severity and stage of the illness," Alzheimer's patients typically need "assistance with transportation, with finances, with medications, or in more advanced stages with more basic activities, providing meals, supervision to prevent wandering or other kind[s] of safety problems." ECF No. 64-1 at 114:14-19.

These are exactly the types of services that Plaintiff does specify Vladimir needed—namely, transportation, supervision, and coordination with his caretakers. Such services are social services, not medical care. To the extent that supervision can be characterized as medical treatment, the jail staff provided Vladimir with such treatment during his incarceration. The jail

United States District Court
Northern District of California

staff's failure to "provide further treatment, or to ensure further diagnosis or treatment, or to monitor [Vladimir] or follow up on his progress, are all facts which go to the reasonableness of the medical care provided, but do not constitute a failure to *summon* medical care" under California law. *Castaneda v. Dep't of Corrs. & Rehab.*, 151 Cal. Rptr. 3d 648, 664 (Ct. App. 2013). As a result, Plaintiff has failed to raise a dispute of material fact as to the applicability of the exceptions in §§ 845.6 and 855.6. Defendants' motion for summary judgment on Count Five is therefore GRANTED.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment as to Counts One, Two, and Five. The Court DENIES Defendants' motion for summary judgment as to Count Three.

**IT IS SO ORDERED.**

Dated: February 6, 2018

_____
LUCY H. KOH
United States District Judge

United States District Court
Northern District of California